Thank you, Your Honor. My name is Colin Waddell. I'm from Sidley, Austin, and I'm appearing on behalf of the plaintiffs and the appellants. I'd like to reserve three minutes of my time for rebuttal, and I'll watch the clock, but I am aware that the Court has given us a significant amount of time this morning, so I'd like to take just a minute at the beginning to set the stage for what we're discussing today. Could you speak into the mic carefully? Thank you. Yes, Your Honor. The public's ability to observe governmental proceedings is vital to the First Amendment's express protections for free speech and a free press and the right to petition the government. There are, of course, open questions about how far that right of observation extends, but this case doesn't test those boundaries. This case is about executions, and this Court has already held that the public has a right to view executions. And this case, which is still at the pleading stage, asks for no more than the ability to observe critical facts about three facets of an execution that would all be observable but for Arizona's policies of concealment. Can I ask a couple structural questions about the case? Yes, Your Honor. First of all, the district judge did find in favor of the capital defendants on a procedural due process claim, right? He did, Your Honor, yes. And what is the status of that? I mean, what for – I mean, is the reason why we have jurisdiction because this was a denial of an injunction on the other grounds? Is that what it is? No, Your Honor. There was no injunction. So why – what's the jurisdiction? We have jurisdiction. This Court has jurisdiction because our complaint had three categories of claims. It had an Eighth Amendment category of claims, a Fourteenth Amendment due process category of claims regarding Arizona's changes to its execution protocols, and a First Amendment category of claims regarding access to information about executions. The district court dismissed with prejudice our First Amendment claims, but in large part did not dismiss our Fourteenth Amendment claims and our Eighth Amendment claims. Okay. We sought Rule 54B certification. The district court denied it. We went on to litigate the Eighth Amendment claims and the Fourteenth Amendment claims and ultimately settled each set of claims with the State. I see. So there's a final judgment on those claims. Yes, Your Honor. The final judgment is at excerpt of Record 12. So you can find it there where the district court articulates that his entry of the Fourteenth Amendment claims constituted the final judgment in this matter. So then I don't – I haven't looked at the judgment. And then there was also a second case as to which there was a settlement on some First Amendment-related issues, right? If you're referring to the Guardian case that was also going on in the District of Arizona, that was in front of a different judge with different plaintiffs. I am not aware that there was a settlement. No. There was summary judgment in part for the plaintiffs. Right. And then the case proceeded to trial on claims that were similar to those that we advance here. I believe that after that trial, in large part, the judge decided for the State the – And where's that case? It is appealed to this Court, and I believe briefing in that case is stayed pending the resolution of this appeal. And then thirdly, there was a second – there was a 1915 set of protocols, and then – I mean, 2015, and then there was a 2017. Your briefs are about the 2015, but there's a new set of directives. Is that right? It is, Your Honor. There have been a number of different protocols entered throughout the pendency of this case. The current set of protocols appears in the supplemental excerpts of records submitted by my colleague. That's from June or July of 2017. I believe it was January of 2017. Well, there was a January, but then I think there was another one. There may have been. But that's what we should be looking at, and it, as I understand it, takes out of the case the question of whether you can – whether the witnesses could view the execution from the beginning to the end. We wouldn't say that it takes out of the case. View it. View it, not – As I will touch on later, it is our position that viewing includes the items that we are seeking. But for – would I take your question to the – Visually observed. Visually observed. Yes, Your Honor. The new protocol removes the issue from this case about the curtain being closed and the discretion that the director used to have to close the curtain. That was in our complaint. Right. It has been addressed in the newest version of the protocol. Okay. The district court in this case incorrectly dismissed our First Amendment claims and did so without leave to amend. But we have more than sufficiently alleged that Arizona's policies violate our First Amendment rights to view executions and to access courts. So we ask this court to reverse and allow us to proceed to discovery. And so I can address first the right to view executions claim, and then later I'll touch on the right to access courts and the leave to amend issue. On the right to view executions portion of this case, there are two different ways to approach that issue, each of which get this court to the same place. The first is that this is a simple, straightforward application of California First Amendment coalition versus Woodford. Now, I want you to tell me again what's in dispute because the visual observation is not. So we're just talking about sound? No, Your Honor. The three items in the – That's why I asked the question I asked the first time. Understood, Your Honor. The three items in dispute are the nature of the drugs, the sounds made during an execution, and the qualifications of the person's Right. So what's the – why are we talking about visually observed, then? Because in California First Amendment coalition versus Woodford, this court defined the scope of viewing to include, quote, the elements that are – sorry, the quote begins now – inextricably intertwined with the process of putting the condemned inmate to death. And in our view, the sounds made in an execution, the qualifications of those who have to administer drugs, and the nature of the drugs themselves are inextricably intertwined. But are there any cases saying that those elements are inextricably intertwined with viewing? Other than this Court's previous decision in the preliminary injunction from this case, the Wood versus Ryan decision, no, Your Honor. Anywhere in the country? Yes. In the Middle District of Pennsylvania, there was a decision in Philadelphia Inquirer versus Wetzel, which we discuss in our papers, that did hold that – inciting Woodford approvingly held that the First Amendment does encompass full auditory observation of an execution. But – What about the qualifications and the drugs used? I'm not sure about that, Your Honor, but I think the second way of approaching this helps to confirm that Woodford does apply and that the First Amendment right of access does attach. And that's using the basic history and logic test of the First Amendment. That test holds that the First Amendment right of access to information attaches when either, one, the place and process historically have been open to the press and general public, or, two, public access plays a significantly positive role in the functioning of the government process. And in our complaint, we amply allege both a history of access and a logic of access to the elements at issue. Beginning at excerpts of Record 268, we then proceed for 20 pages to discuss the history of executions in Arizona and how sounds, sights, information about the instruments of death – I would like you to separate out the sound issue from the other two. The sound issue seems much easier from your point of view. I mean, in the sense that, I mean, historically, what you could see, you could hear, so that doesn't – it doesn't appear that anybody was prevented from hearing anything in the history that led to Woodford. And in Woodford itself and the ensuing cases, it seems to me that, you know, there was an assumption that what you were seeing, you were hearing. The notion that you wouldn't hear it – but the other two issues are a lot harder. Understood, Your Honor, and so I'll minimize the time that I spend discussing sounds. In our complaint, beginning at excerpt of Record 271, we discuss how it was a known fact throughout the nation that all sodium thiopental used to conduct all lethal injections was made by Hospira and later by Lundbeck. And when those companies ceased providing that drug to the states, states turned to compounding pharmacies. At excerpts of Record 279 and 280, we discuss how Arizona then began obtaining its drugs from a pharmacy operating out of a driving school in London. At 284, we discuss how Arizona received drugs that had become expired. At 288 and 289, we discuss how a district court in Arizona ordered Arizona to provide the exact information about the drugs that we're currently seeking. And at 297 and 298, we discuss how even after the execution of Joseph Wood, Arizona again attempted to obtain drugs from overseas, from India, that were seized at Sky Harbor Airport. Are you tying this directly into the visual – the ability to visually view in the sense that if you look close enough and saw everything you would see, you would probably – I guess when we get drugs, they say who manufactured it. So if you were looking close enough, if you were – you could see who manufactured it, I don't know about the provenance of it. Or are you doing something more abstract than that? Is it a variety of an access claim to something that you wouldn't visually see but need to know to understand what you're visually seeing? It's both, Your Honor. So that is part of our argument under the application of Woodford, that in an analogous medical setting, which is the closest analogy you could draw, you would be able to see not from up close but from a decent distance the logo on the drugs used, the certifications of the person administering the drugs. You'd be able to tell if they were a doctor or a nurse or a paramedic. How would you see that? One, from their uniforms. Two, from their name tags. Three, from, you know, usually words written on scrubs. But the point is, yes, that is one way that we would approach this argument, but it's not an essential way to decide this case, because this Court and the Supreme Court has long held that memoranda, transcripts, filings that go into a particular process are necessary to have a meaningful observation of that process. And here's the point. Sotomayor, I think it was the Supreme Court's reversal of our Court. After we have Judge Bybee's dissent where he says, essentially, all of that only applies to court proceedings. It doesn't apply to executions, mainly. That was his overall point. And the Supreme Court, I mean, actually rules – I mean, I guess it was ruling on the merits of the – what was a preliminary injunction, and maybe you say, well, it was only a preliminary injunction. That is what – sorry. Go ahead. That is what we would say. It was – I mean, as a legal matter, it was a preliminary injunction. And obviously, as this Court knows – But that's almost worse, because the determination was that there were serious issues going to the merits, and they reversed it. Correct, Your Honor. Just to put it in the right procedural posture, the district court had denied an injunction, and this Court held that the district court abused its discretion. So we – all we can do is speculate about the Supreme Court's unsigned vacator of this Court's decision, but at most it means that the district court had not abused its discretion in entering a preliminary injunction. And I think we can take from that that if there was enough there to plausibly support a preliminary injunction, here there's more than enough to at least plausibly state a claim. But there's a more fundamental fact about the previous iteration of this case in the Wood litigation that is worth noting, which is this Court's decision and the Supreme Court's decision to vacate this Court's decision happened before the execution of Joseph Wood. And things have very much changed. The State of Arizona represented to the Supreme Court in their briefs to the United States that – quote, and this is in our complaint as well, at 263, nearly every detail about Mr. Wood's execution has been provided to him and to the public. But that was very wrong. Every detail was not provided to him and the public. Kagan. But that goes to, as I understand it, the part of the case that you won in the district court and then settled, i.e., their discretion to change these protocols after they've assured everybody they're not going to leads to due process issues, and the district judge so recognized, rather forcefully, actually. I don't think that's true, Your Honor, because the part of this case that was before this Court before and that the petition for certiorari was taken on was on the First Amendment piece, not the Eighth Amendment or the Fourteenth Amendment pieces. And, obviously, to this day, because the public was unable to – I know, but I'm not understanding how the fact that the – Arizona did not do what they said they were going to do for the yumpty-yump time leads to the fact your ability to get information about the manufacturer and – you're using the language now, quality of the drug, and I don't know what you mean by that. But something about the drug other than what it is and how it will be used, as I understand it. Yes, Your Honor. There were two different questions there. I can pick up on the quality piece at the end, which is simply that – and, again, this goes a little bit to your earlier point that our complaint was filed well before the current iteration of the execution procedures were at issue. But what we are seeking about the drug – at the time we filed our complaint, Arizona obtained its execution drugs from branded manufacturers. And simply being provided by an FDA-regulated pharmaceutical company conveys a host of information about the drug, such as its purity and its stability. That was represented in the – to the Supreme Court in the – in the – is that what you're saying? No. That's our argument now. I think in the Wood execution, though, to go to your other point, it wasn't just that Arizona did not follow its protocol. It was that the public did not know then and still does not know now why the execution went wrong, in part because they couldn't hear what was happening, in part because they couldn't see when Arizona was administering drugs to Mr. Wood.  But the second part is out of the case now. Yes, Your Honor. In the first case, I've asked you to put aside. So now how does it get you the information about the drugs? So for the information about the drugs, I think we should turn to the logic point of the test, because that's independently dispositive of this issue, even without a history of access. And logic is a shorthand way of describing whether access plays a significantly positive role in government functioning. And this Court has defined a positive role in both the Woodford case and in Lee v. Salazar to include preventing wrongdoing, spurring debate, strengthening government by exposing its flaws, and in the execution context in particular, ensuring humane executions. And our allegations and our complaint are ample on those points. We discuss how access to information about the drugs that Arizona uses has helped in the past and would help in the future to prevent the State from behaving in an illegal manner. At excerpts of Record 281. But that's in any way directly relevant to the Wood execution, right? I mean, the problems with the Wood execution were that they didn't do what they said they were going to do, basically. I don't know that, Your Honor. No one knows what the problems with the Wood execution were, and in some ways it's now suing. Well, I thought they said they were going to have one injection and they had 13. Correct. But it's not understood. Then we're going to use a certain amount of the drug and they use way more of it. That's right, Your Honor. But in some ways the Wood execution has become sui generis. Arizona no longer uses that drug protocol. They've moved to another protocol using either sodium thiopental or pentobarbital. And so the instance that I just raised about the FDA lawsuit and about seizing, about preventing Arizona from importing drugs that are misbranded from overseas, that does apply, because they tried to do that with sodium thiopental, which is now one of the things in their protocol. I see that my yellow light is on. I'd like to reserve to balance my time for rebuttal. Thank you. Good morning. May it please the Court. I'm Dominic Drayen with Jeff Sparks. I represent the defendants' appellees. The question in this prison access case is how far plaintiffs can stretch. Would this Court... This isn't exactly a prison access case. It's going on in the prison, but... It certainly is. And this Court in Woodford, I'll direct the Court's attention to page 877 of that case. I think we all kind of agree that Woodford is the controlling precedent from this circuit. The Court there says, Our level of scrutiny must be guided by the line of cases addressing constitutional challenges to prison regulations, rather than those governing access to governmental proceedings. Then it goes on to describe the Court's hands-off attitude to prison access cases and to discuss the Turner standard rather than a sort of strict scrutiny. But if I were to back up and situate that, that's all within Roman numeral 2 of the Woodford analysis. Part 1, and the first of two insurmountable hurdles that the other side has to overcome as a legal matter, is whether a constitutional right exists to discover this information under the First Amendment. Let's start with the auditory, the oral viewing. Yes. What... I wasn't quite sure what the district court held about this, but Woodford and every other... Well, Woodford and the history that Woodford relies on certainly contemplated that you could see what... hear what you could see. Did it not? I don't know that that goes as far as what the other side is saying. I also should add here that... I don't understand that. Well, what they're asking for is a miked-up execution chamber so that they can hear every sound during the entire... Can you describe the physical setup? Yes, Your Honor. As an initial matter, the room in question is now open from the entire time that the person enters through his being declared deceased. I'm saying like physical, like is there, there's a glass... window. It's not soundproof, which is an important thing. It's actually interesting. That slips in in the reply brief for the first time, this concept that it's soundproof. It's not soundproof. They don't allege that in the complaint, which is, of course, the operative thing here, and nor could they. It's just a glass window like here, which goes to my point in response to Judge Berzon's question, which is the audio that's available is sort of natural sound, but through glass. So the same way that if I were in here and the questioning got really terrible and I started to shriek in pain, someone walking by, I guess that's the roof, but someone walking by on the roof would be able to hear loud shrieks of pain, but they wouldn't be able to hear every little noise or if I reference Mr. Sparks by name or something like that. And that's what we're talking about opening up to discovery. The other thing that I should note at the level of the facts of how the protocol... The mic was on before, right? The mic is on while the TV is on. The mic is on through the insertion of the IV line. Yes, Your Honor. And it's turned off. At which point it's turned off, correct. Right. And that is, I think, consistent with the history and tradition of what a person can hear. The audio that would be available to someone attending a town square hanging would not be perfect mic'd up audio. You'd be in a crowd. The person would be up on the gallows. Okay, well, then why not... Maybe you're right that you don't get the right to amplified sound, but I think the public is entitled at least to the sound that would be available if that glass partition weren't there, right? Because that historically is how, at least when executions were conducted in public. So I don't think you have any sound basis to say that we can seal off the execution chamber and prevent just whatever could be naturally heard. I'm going to push back a little bit on Your Honor's premise. I expect you. I'm just saying that's kind of how I think of it. So why is that wrong? Right. So for one thing, consider gas chamber executions. Those are part of the history and tradition as well. And then at another, at a legal point, that's sort of apart from the historical facts of this practice, is that the standard changes with the means. And we know this from this Court's Seattle Times precedent. The standard for a history of access and for the second prong, which also helps to answer Your Honor's question, which is they're conjunctively joined, by the way. There has to be a history and tradition. This is under Press Enterprise from the Supreme Court. And it has to serve a significant positive role in the functioning of the particular practice in question. That's direct language from Press Enterprise. So it has to be a significant positive role. The marginal gain from having sound mic'd up is not a significant positive role at all. I thought you were going to respond to my question. Stop using the mic'd up. Okay? Oh, sorry. Because I'm fine. I think I agreed with you that maybe you don't get amplified sound. But I thought you were going to respond to my question. So some sort of substitute for not having the glass. So fine. You're not going to have, it's not going to be, I think you used some term in your brief that was colorful but struck me as irrelevant. Okay. But just, yeah, like a substitute for if that glass partition weren't there, what could we otherwise use? And I'm taking too long to get to it. But my response is in part the second prong of Press Enterprise 2, which is in this current environment where you're trying to carry out a perfectly constitutional sentence, having access to the voices of the medical team, for example, and the risk that they're identifiable by their voices or that they use one of each other's names, especially in an emergent situation, the Department of Corrections has concluded But there already was access before on the TV. So the judgment of the DOC is that the earlier stages are less likely to involve any identifying words by the people who are going to insert the IV. And that judgment, I think, is entitled to all the discretion that by pointing out that this is a prison access case. It's the hands-off environment of prison regulation. And that the Supreme Court has upheld countless times. Pell, Houchins. Well, Pell, I mean, you should start with Pell and Saxby. I mean, they actually begin from the premise that nobody actually was trying to restrict access to the prison for purposes of not being able to see what was happening in the prison. And I guess the closest case that might support you is Houchins, but it's an oddly split case. And it has a few sentences that seem to say this. But Pell certainly doesn't. Pell seems to have gone quite the other direction. Pell said that the reason why they weren't allowing these interviews is because they had security, you know, separate security and other reasons for doing it. But the assumption was that there was no attempt to restrict knowledge and access to what was going on in the prison. The purpose for which I cite Pell. And you're directly trying to do that. This is, in other words, your explanation for why they want to do this is specifically so that you know the public knows less about what happened during the execution than it otherwise would. Well, I don't know that that's a complete picture of the state's purpose in restricting this. The goal is for us to be able to carry out a constitutional sentence. We know from Glossop the Supreme Court says that the death penalty is constitutional, it's settled, and it follows as a logical matter that there must be means for carrying it out. So the reason for the state doing this, and this is, again, getting to the standard from Turner, and it's sort of Turner plus because Woodford says we're not going to do just rational relationship. It has to be a slightly closer fit. So with that in mind, the state says we're going to take steps to preserve anonymity of sources and personnel so that we can continue to carry out this constitutional penalty. But you're being a little, you know, you're saying two different things here. You're saying, yes, we can restrict this so people don't hear the voices of these people, and then you're saying, but actually they can hear it. I mean, you're saying, you're essentially saying we're, we are, we're not, we're restricting the sound, but not entirely. That's correct. And that's our effort to comply with closer fit. If Your Honor thinks that we could nix the sound for the whole time, we're certainly open to that, although I don't think the State feels compelled to do it. The goal here is to preserve the anonymity of these people during the time when we think there might be emergent circumstances. I must say that I could not pick up anywhere in the briefing that that was the reason or what the reason was. On the auditory, I understand the rest of it, but on the auditory. Okay. I think that we have made that point. I don't recall the page numbers in our briefs, but identification by voice and the use of names are expressly listed in our briefing. I think that's right, but I thought in Woodford we actually sort of suggested that the fear of, because it's mainly fear of retaliation, right? And I thought we basically said in Woodford that that doesn't cut it as a means of, at least as, you know, to the extent we're kind of balancing the public's interest in getting this information versus that concern, I thought we basically said no, that's a no-go. Two responses, Your Honor. The first is Woodford acknowledges, and this is on page 882 of that opinion, prison officials may pass regulations in anticipation of security problems. Prophylactic measures are okay. It doesn't have to be the case. And the others, our friends on the other side sort of insist in their briefing that we have where is the threat, who's saying that they're going to come get the nurses or whatever. That's not necessary. Prophylactic measures are okay. And this is a line of cases. But as long as it's not totally speculative, and I think in Woodford we said it was exactly that, that there had never been any instance that anyone had ever spoken about in which somebody who had participated in an execution whose identity was revealed was the subject of retaliation in any way. Which gets to the second part of my response, which is that times have changed, unfortunately, since Woodford was decided in 2002. We now have courts all over the country, including the Supreme Court in Glossop, noting, I can find it here, a practical obstacle soon emerged as anti-death penalty advocates pressured pharmaceutical companies to refuse to supply the drugs. Yes, pharmaceutical companies. We're not talking about that now. Yes, well, it's not a very long walk to, and I don't think it's unreasonable, especially viewed through, again, viewed through the lens of deference that Turner requires for prison officials to say that the same sort of reasoning about pressuring individuals involved in carrying these executions out. I mean, I must say that I am concerned about pressuring, because we're back to really a First Amendment restrictive reason, i.e., you don't want people to know things that would cause them to ask someone else to make moral arguments to someone else and say, don't do it. Now, I understand that there's concern that there would be harassment. I don't know what the harassment supposedly consists of. But, again, with regard to the medical people, there's no record of it, whatever it is. That's correct, although I'm pointing out that this is a reasonable restriction when you view it especially through the prison access portal, as is absolutely necessary in this case. And I'm not clever enough to come up with this stuff on my own. The Eighth Circuit en banc in zinc takes this up. The in re Ohio execution protocol, which we cite in the briefs, talks about it. What's the this? The intimidation of people who carry out or work on execution teams. The Ohio case is one that the court below cited and found to be persuasive. All of this is totally appropriate, by the way, for courts to take notice of, especially the Supreme Court discussion and glossop, because under F.R.E. How about pharmaceuticals? I mean, how can you take notice of something that hasn't happened? Well, it's the exactly parallel concern, that the same way that you can pressure a pharmaceutical company, it's actually probably much easier if you find out who a doctor is to go and picket his house and get him to say, enough's enough. I'm not going to do these procedures anymore. But I mean, I think of this as involving a balancing of the prison's legitimate interests, and I don't doubt that the interest you're expressing is legitimate, but it's got to be balanced against the public's interest in getting access to this information. So it seems to me it's quite a different balance. The balance is being struck differently. If they're demanding, we want the names, home addresses, and phone numbers of every person who participates in an execution, and we want to put that on the Internet. Okay, that obviously raises much more significant concerns than what we're talking about here is the risk that maybe an inadvertent, you know, someone will say something that will shed light on their identity. First of all, the risk that the harm is going to materialize is obviously much less in that context, much reduced in that context versus the posting the information on the Internet. And the public's interest in getting access to the sounds is so much greater than the bare interest in just knowing who these people are, right? So I guess, how do you say that the balance gets struck in our context in your favor? Yes, well, there's kind of a lot in there. I think I would begin by pointing out or reminding the Court once again that some sound is available. Almost no sound occurs without some visual cue as well. So people who are watching have all of these benefits. As for the sort of balancing question... I mean, as happened, I gather, in a towering execution, the defendant was talking. You're not going to hear it, right? Yes, I think that's correct. And we wouldn't, you know, the unfortunate thing is when I anticipated maybe the question would be to comply with CloserFit, could you just distort the voice, distort the sound in some way? But I suspect the other side would be here with a lawsuit saying, well, now you're distorting our ability to hear every grunt and groan from the inmate as well. So we're trying our best to do a close fit on this point, which is why the sound turns off after the IV is inserted and after the condemned has made a statement. Do you want to talk about the other two issues? I'd actually like an answer to my question before you move on. Yes, could you please remind me what... I'm saying there's a balancing that needs to go on. And it seems to me in this context, the public's interest in getting access to the sounds is so much greater than the kind of speculative concern you have about, well, in the course of an emergency, somebody might blurt out the person's name or say something else that would disclose their identity. So I'm not so sure that that's right because of the amount of information that's already available and the ability of news media, including plaintiffs, to comment on what death is like when dosed with pentobarbital or sodium thiopentol. This is information that already exists. They already know the drugs that we're going to use, in part because we settled with them the choice of what the drugs are going to be. You're talking about the sounds that would... Yes, I understand that. But part of my response is when you know the rest of this context, you know whether death as induced by these drugs is painful or not painful. And even if you're there observing and you see someone sort of visually letting out a shout, I mean, it's the marginal benefit from what they're seeking to discover is extremely low. The same thing actually goes for the other areas of discovery. I mean, they say qualifications. If you look at the prayer for relief, in case there was any doubt that this is just a discovery demand propounded under the First Amendment, the prayer for relief at 314 through 17 of the excerpts goes into... It reads like something I saw when I was doing trial work where it's give us all the documents you have related to qualifications. If the proposal were a discovery request, would they have a right to it? No, certainly not. And that's... If the proposal was a discovery request in a case by an individual defendant facing imminent execution. Okay, great question. And this is a point that I think comes up a number of times in this. If someone wanted to make an Eighth Amendment claim, like, for example, nurses are no good at placing IV lines. If you allow nurses or EMTs or whatever qualification it is to place my IV, there's a chance that I'll... Or whatever the standard is, a certain or substantially likely that I'll experience undue pain. Let the individual condemned bring that claim to the protocol and say, you shouldn't be allowing EMTs as part of your protocol. Then they can have discovery on that. Maybe they can get a decision in which the state strikes EMTs. The same thing is true for the drugs. If the claim is that you're going to bring in drugs from overseas and we don't trust drugs that were made overseas, even though, by the way, they're subject to testing by the Department of Public Safety, which is the Highway Patrol. But there have been issues about whether they were legally imported and so on. Yes, of course. But given the fact that we have... And this is part of the settlement below. It's at SER 30. And then that concerns the testing for quality and purity of the drugs. And then the drugs will not be expired. It's at Docket 186 at 4, which is part of the settlement agreement. All of this information is already available. So the only thing that remains for the other side to claim is that they kind of... Wait a minute. It's already available, meaning in an appropriate case, it would be provided in discovery? Is that what you're saying? Well, we already tell people what the drugs are. We can't say where they're going to come from. That's prohibited by state law, which is the whole point of today's exercise. Exercise. The testing that occurs with the Department of Public Safety, I think could be obtained through public records request. But at the very least, the protocol specifies that they will test and confirm the purity and potency of the drugs. Would it be obtained by a public records request? I'd actually have to get back to Your Honor on that. I thought not. The potency and purity part, I'd have to respond to... I actually don't know the answer to that question. But what we do know is that that testing is conducted. There's absolutely no reason. I mean, if Iqbal and Twombly mean anything, it can't be the case that they can show up and say, well, we think you're going to smuggle in illegal drugs and use them even though they're of poor quality. The other thing about the importation point is that... Well, because it's happened. It's not like they're making up the possibility that this could happen. It's happened. Well, so it's true that some of our drugs were seized in the past and the lawsuit concluded that that was inappropriate. That was not established at the time, by the way. And nothing about this protocol... What time? At the time of the Cook decision, which I think is what my friend on the other side refers to when he talks about their successful litigation. At the time, that was acceptable. And the FDA and DEA were on board with Arizona's importation procedure. We are a licensed... We actually just went through the process of renewing it. A licensed DEA importer, which means that you comply with all kinds of other regulations. So the information that's available is abundant. The other thing I'll point out, and this is a point that the district court made in the Guardian News case, is that the ability to comment on what the state is not telling you is also sufficient to conduct the other side's advocacy. So you can say the state won't commit not to buy its drugs overseas, or the state won't commit that there will be no EMTs on their execution teams. All of that is available to the other side to make their argument. To hear them present it here today, it sounds like this entire discussion, the press enterprise two steps, history and tradition, and a significant positive role for the function at issue, plus the second hurdle, Roman II of Woodford, about the Turner Standard and the extreme hands-off deference due to the state, that it all collapses into part two of press enterprise, and it's just a policy discussion. But we know from Bayes the Supreme Court has said that courts do not sit as panels designed to pick out best practices, which is their term. And although there may be things that the other side wishes were done differently, they do not offend a constitutional right. I have an off point, back where I started from. The settlement of the due process claim, is that in the record or available? In this case? Yes. Yes, I believe that's docket 186. Okay. There's nothing further? Because I'm just curious about how that deals with some of these questions, i.e., what it is that they're... Oh, yes. And then I also commend to Your Honor's attention the supplemental excerpts with the current protocol, which I think we mentioned. And that I know, and that I know. Okay, terrific. But I don't know, I haven't seen the settlement. And I, I mean, it did seem to me that the capital defendant's access to court claim seemed to be the same as his due process claim. I couldn't understand what the difference was, or why there wasn't a complete overlap there. If the court is interested in the access to courts claim, I think it's probably not worth using much time. But, you know, the court in Lewis, Lewis v. Casey, explains how you do not have a right to discover claims, or to discover... I'm not sure anybody's fighting about it, because it seems to me that it's basically the same as the due process claim. I would be very content with a ruling to that effect. Because it's, it's basically we need enough to effectively access courts, and that's, I understood the due process claim to be. I think that's a reasonable disposition. Okay, thank you very much. Thank you. Thank you, Your Honor. Just a few points on rebuttal. First, to pick up on that last question, the due process claims were about Arizona's discretion to change their execution protocols at any time. It was not about the, the right to the information that the condemned prisoner plaintiffs need to bring their lawsuits. You didn't raise the due process right to the same information that you're looking for. Correct. They are separate claims. But I'd like to pick up on one of Judge Watford's observations, that fear doesn't cut it. And that is true, and that this Court has articulated that concept in the history and logic balancing many times. It requires evidence. It requires facts on the record to substantiate the State's speculation that there will be any negative consequences from the access we are seeking. This case is at the pleading stage. We have plausibly alleged that the First Amendment attaches, but that's not the end of the story. Obviously, the next step is to go to discovery, to obtain documents from the State to have them substantiate their fears about the IV team being identified, about manufacturers actually not providing drugs to them, about sounds being any sort of a, a difficult burden for them to provide. As you mentioned, it's not a mic'd up execution. The mic already exists. The State affirmatively turns it off. That is not a difficult thing for them to comply with, but it, that's not something that will be resolved today, because it has to be resolved with facts on the merits. And, and it has to be balanced. And so, to touch briefly on my colleague's point about glossip, the observation in glossip about difficulties that States had in obtaining drugs was made in the manner under which the Court ruled it could not hold a method unconstitutional if a State has no other viable alternative. That does not impact the scope of the First Amendment's right to observe executions. And one underlying theme of my colleague's argument was that all of this is some form of advocacy against the death penalty. But it is not. This is about informing public debate. The public has the right to support capital punishment or to oppose it. But to do either of those things, it needs sufficient information about it. And your questions about the drug manufacturers and my colleague's point that the plaintiffs somehow know everything there is to know about the drug manufacturers is untrue. As we've seen in the last several months, there have been a spate of lawsuits around the country in Nevada and Nebraska and Arkansas by drug manufacturers who did not know that their own drugs were being used by States in executions and who alleged that States obtained those drugs through deceptive practices and through violating agreements with the State or with the drug companies. Why isn't that a better context in which to litigate these issues? Why? Would it be a better context to let the drug companies? Because, I mean, the access to the information regarding the details of the provenance of the drugs. The manufacturer may be, but the rest of it seems fairly attenuated given the case law. Unless we, you know, buy into Woodford itself directly and we have a problem which is it got reversed. I see my time is up, but I can answer your question briefly. Go ahead. I don't think it's attenuated under the case law, again, because this is purely at the pleading stage. And if they prove on discovery that it would be permissible and a legitimate penological purpose to restrict. But first you need a cognizable First Amendment right. And where is it coming from? It's coming from the fact that we have historically known where every, the manufacturer of every drug that Arizona has used in its executions to date. You mean historically in the last 20 years? Yes, Your Honor. We have known, and we detail it in our complaint at the excerpt of record sites that I laid out in my first argument, that the public has known where each of these drugs have come from in the past and it hasn't hindered Arizona's ability to carry out executions. Well, it has, or they would say it has, because they had to switch protocols because some of the drugs became unavailable. Even after the FDA lawsuit that prevented the State from illegally importing drugs, they immediately switched to another drug the next day. Right. It was before this Court in, I believe, the Dickens litigation. They immediately switched to pentobarbital. It did not even hinder their execution process for a day. Okay. Thank you very much. Thank you, Your Honor. Thank you both for your useful arguments in a difficult case. The case of First Women Coalition v. Ryan is submitted and we will take a break until we are told that we have connected to Guam.
judges: Berzon, Rawlinson, Watford